**HEIRS OF JOSÉ CRUET Y ARROYO, Plaintiffs and Appellants, v. IRIS MANDÉS Y CRUET ET AL., Defendants and Appellees.**

No. 3774.   Argued February 4, 1926.—Decided July 21, 1926.

*José J. Aponte* and *R. Rivera Zayas* for the appellants.   *José J. Acosta* and *José E. Figueras* for the appellees.

MR. JUSTICE HUTCHINSON delivered the opinion of the court.

Plaintiffs appeal from a judgment of dismissal, and as a ground for reversal specify manifest error and prejudice in the weighing of the evidence.   A "statement of the case and opinion" filed by the district judge reads as follows:

"The plaintiffs herein are some of the heirs of José Cruet Arroyo, who died in Guayama, Porto Rico, leaving an open will and testament, on June 14, 1922.

"Plaintiffs seek with this action the annulment of the legitimation by Victoria Cruet Colón, daughter and sister, respectively, of the plaintiffs, of a child named Iris who appears recorded in the civil registry as legitimate daughter of said Victoria Cruet and of her husband, Isabelino Mandés, the annulment of said entry being as well requested.

"In support of their pretensions the plaintiffs allege that said child, defendant Iris Mandés Cruet, is not the legitimate daughter of the spouses Cruet Mandés, who acknowledged and legitimatized her as such, but the natural daughter of Antonia Rivera and Juan Montero, Victoria Cruet Mandés having taken her when the mother of the child attempted to drown it in the Guamaní river, due to her being in an apparent state of insanity.

"That José Cruet, father of Victoria Cruet, the person who legitimized the child Iris, died in Guayama, and that such legitimation affects the rights of the plaintiffs as heirs of their husband and father.

"In support of the facts alleged, documentary evidence has been presented to show the entry made in the civil registry of the birth of the child Iris as a legitimate daughter of Isabelino Mandés y Montes and Victoria Cruet Ramos, a death certificate of José Cruet, of his daughter Victoria, and of Antonia Rivera, the alleged mother of the child, and, besides, copies of the will of José Cruet and oral testimony.

"The whole case is made to rest on such oral testimony which tended to prove the averments of the complaint.

"This is a special proceeding by which a child of from twelve to fifteen years is sought to be deprived of her rights of legitimation and with them of the part of the inheritance of her grandfather to which she is entitled in representation of her legitimate mother Victoria Cruet, as appears from the civil registry, and, given the importance of the case and the consequences that would result from its decision, we believe that the evidence should be so strong and convincing as not to leave any doubt in our minds with respect to the certainty of our decision.

"Manresa, in volume 1, page 520, of his work, Commentaries on the Civil Code, in analyzing the evidence necessary to prove legitimation, says:

" 'Experience has disclosed the perils and inconvenience of oral testimony, especially when the person charged with the paternity has died.'

"In the instant case both the alleged legitimate mother of the child and the one charged with the false legitimation now attacked

are dead, all the evidence remaining in the hands of persons entirely unconnected with the defendant child, to whom they are in no way related. It is also to be noted that the alleged natural father has not appeared, his whereabouts being unknown, this child remaining, therefore, at the mercy of the enemies of her rights, as even Isabelino Mandés, her legitimate father according to the registry, and the person who had the child recorded as his daughter, appeared before the court to testify against his own acts, and is helping the plaintiffs to secure that which will deprive the child Iris of her name and of her right to the inheritance of her grandfather.

"Could we, on that evidence and under such a situation, render a judgment against a defenseless child and satisfy our conscience?

"Not by any means.

"If we had Victoria Cruet before us; if the voice of Antonia Rivera, the person alleged to be the legitimate mother of the child, should come claiming her maternal rights over her daughter Iris; if the unknown father, Juan Montero, should allege his condition of natural father of the child, perhaps we would alter our opinion, but to deprive the child Iris of the rights acquired by her under the civil registry and by the possession by her for twelve or thirteen years of the status of a legitimate daughter; to give her as mother an insane woman already dead and an unknown father whose paternity we greatly doubt, as doubted as well by the plaintiffs who do not allege that fact categorically in their complaint but on information and belief, appears to us too hard and contrary to the principles of strict and full justice.

"In studying this matter we have found very few cases similar to this.

"The Supreme Court of Spain in a judgment of January 5, 1900, although analyzing provisions of the old Civil Code, at present repealed, expressed its opinion on the matter in the following manner: 'That the status of an acknowledged child in possession of the same as such in a family can not be annulled without it being conclusively proved that the child has a distinct status known by all, or that it could not have been begotten by the person who acknowledged it when only the question of the paternity is involved, even though it be so stated subsequently by the father himself contradicting his former acts.'

"We believe that these principles are applicable to this case where a distinct status of the child Iris as daughter of an insane woman and an unknown man has not been shown, and where Isabelino Mandés has failed to prove the impossibility of such child having

been begotten by him or having been born of his wife, but has denied that he is its father notwithstanding the fact that he had recognized it in the civil registry as his legitimate daughter. Besides, it is to be noted that the possession by Iris of the status of a legitimate daughter covers a period of from twelve to thirteen years and it is sought to deprive her of it when her mother, Victoria Cruet, is dead, without regard to her wishes, or those of the maternal grandmother and uncles, or even of the husband, Isabelino Mandés, who participated in the recognition.

"And going into the spirit of the Spanish Civil Code, which is the source of our substantive civil law, although certain provisions thereof are not in force at present, we will say, as Manresa says in volume 1, page 522, of his work:

" 'These facts, not theory but positive legislation, will aid in the understanding of the *restrictive character of our Code, the framers of which, no doubt, had in mind, in adopting this view, the prudential reasons which are always urged in these cases to prevent malicious, useless, troublesome and scandalous litigation in the family.* Although experience in other countries furnishes facts which militate against this fear, still those reasons may be alleged to avoid such an absolute liberty as that of the Bavarian Code; but certainly not in connection with the intermediate terms of the Code of Napoleon and of our civil marriage law of *considering that laws favor the weaker one, the child, and that with prudent and experienced courts it is more difficult than it seems to succeed in a claim contrary to the truth.*' (Italics ours.)

"These principles are sustained substantially by our jurisprudence, inasmuch as in the case of Alcaide v. Morales, 28 P.R.R. 258, the Supreme Court expressed itself thus—

" 'It is clear that the evidence presented must be so strong and convincing that in annulling an acknowledgment voluntarily made the court is fully convinced that that and no other is the action demanded by justice.'

"Under such doctrine and guarding the interests of a defenseless child, we believe that the ends of justice and equity will be better subserved in this case by dismissing the complaint without a special pronouncement as to costs."

In the foregoing statement we find no indication of **passion or prejudice.** Nor do the appellants rely upon anything said by the trial judge in disposing of the case, but

point to certain questions asked and remarks made by him during the progress of the trial.

Had these incidents occurred in an ordinary controversy between parties more or less equally matched and in a case wherein no question of public policy was involved, the contention would be entitled to somewhat more serious consideration. Here, however, the action complained of can not be torn from its setting and alone considered, but must be interpreted in connection with all of the surrounding circumstances and in the light of the law applicable to a case of this kind. The complaint herein was filed on December 19, 1924. It alleged that the defendant, Isabelino Mandés, on March 14, 1914, personally appeared in the civil registry of Guayama and placed upon record the birth of a child named Iris as the legitimate daughter of himself and of his wife, Victoria Cruet Colón, and as having been born on the 17th of February of the same year; that at the time of making the said entry the said Mandés stated and caused to appear therein, among other things, that the maternal grandparents of the child were José Cruet and Ramona Colón; that the said Mandés did this knowing that the said child was not the legitimate daughter of himself and of his wife, Victoria Cruet, as was made to appear; and that José Cruet and Ramona Colón were not the maternal grandparents, inasmuch as the said Mandés and his wife, Victoria Cruet, had no children living at that time. Plaintiffs also allege upon information and belief that the child Iris was the natural daughter of one Antonia Rivera and of an individual named Juan Montero, having been born in a house or tenement house, the property of Bautista Soto in the barrio of Guamaní at a date prior to that named in the civil registry; that the child Iris was rescued by Victoria Cruet, wife of Mandés, at the moment when the mother, being insane, was attempting to drown it in the river Guamaní; that Victoria Cruet died without issue in Guayama on August 8, 1920, being survived by her parents, José Cruet and Ramona Colón;

that the actual mother of the child Iris died in Guayamá on May 15, 1913; that José Cruet also died in Guayama on June 14, 1922, leaving property and a last will and testament wherein plaintiffs and the said Victoria Cruet were designated as his sole and universal heirs; and that the plaintiffs have to divide the inheritance of their said ancestor, José Cruet y Arroyo, and they have not been able to do it because in order to do so it is necessary to determine this case in court to obtain the annulment of the status of the child Iris as · legitimate daughter and descendant of the spouses Isabelino Mandés and Victoria Cruet, on the ground that the entry made of her birth as legitimate daughter of the spouses Mandés-Cruet is untrue and based on no legal cause; and if such entry should subsist the child Iris would be entitled to the inheritance of her alleged grandparent, José Cruet y Arroyo, in representation of her alleged legitimate mother, Victoria Cruet, both deceased, and the said entry prejudices the right of the widow Ramona Colón, legitimate mother of Victoria Cruet, who is her heir by force of law, as it also prejudices the rights of the other legitimate relatives of José Cruet y Arroyo, as appears from the facts hereinbefore alleged.

The summons was served on January 7, 1925.

On January 14th plaintiffs moved for the appointment of a guardian *ad litem* under the second subdivision of section 57 of the Code of Civil Procedure, setting forth the solitary fact that the defendant, Iris Mandés, was under the age of fourteen. This motion concludes as follows:

"Therefore, this party prays the Court to appoint as guardian *ad litem* of the minor Iris Mandés Cruet, defendant herein, her uncle Francisco Aponte, so that he may appear as such guardian *ad litem* to defend the rights of said minor in this suit, as she has no mother to represent her, inasmuch as the plaintiffs allege in their complaint that the mother of said child died a few years ago. The said Francisco Aponte is of age and a resident of this city."

On January 23rd the district judge named the district

attorney as guardian *ad litem* and in the same order directed him to take charge of the defense of the minor. The district attorney was notified of this order on the same day.

The action was brought against Isabelino Mandés individually and as the pretended father of Iris Mandés. Plaintiffs, on April 18th, filed a praecipe for default as to the said Isabelino Mandés in both capacities and such default was noted by the clerk on April 20th.

When the case was called for trial on April 24th the district attorney had neither demurred nor answered.

The first witness for plaintiffs was the defendant Isabelino Mandés, who, without objection or opposition interposed at any time by the *fiscal* or any interference whatever on the part of the presiding judge, testified to practically all of the facts alleged in the complaint. The only additional information furnished by this witness was to the effect that he caused the entry to be made in the civil registry in good faith and thereafter consulted an attorney, Celestino Domínguez, in regard thereto, who advised him to apply to the court; and that he loved the child very much, as if she were his daughter. He did not explain why the advice given by Domínguez had not been followed nor state whether or not he had sought legal advice as to his own rights or as to those of the other defendant in the instant case, nor was he interrogated in regard to either of these matters.

The perfunctory cross-examination by the district attorney and the questions and remarks on the part of the trial judge, criticized by appellants, are as follows:

"District Attorney: Why do you claim that she is not your daughter?—Because they want to make the old man's will.—Who wants to make the will?—The heirs, the children of José Cruet.—Did you know the father of that child?—The father was Juan Montero, who had that daughter by that woman.—Do you know the parents of that child?—Yes, sir, the mother is dead.—Is her father living?—He lives in Vega Baja, but he is married.—How old was the child when you had its birth recorded?—I believe it had been at home for thirty-five days.—With whom does the child live at present, with

you?—Yes, sir, I have always supplied all her needs.—That is all.—Judge: Why have you waited until now to do that; why did you not do it before?—I should have done it before.—Are you a widower?—Yes, sir.—Then who are the heirs of your wife today, things remaining as they are?—Her relatives.—But at present, that girl being her legitimate daughter, who would inherit from her, would it not be Iris?—Yes, sir.—Then what they want is to disinherit Iris? And if you had done it before, perhaps your wife would have. adopted her or left a legacy to her.—I should have done it before.—And you did not do it in order to ruin (*reventar*) this child? That is the point; and now, as the mother is dead, nothing may be done and Iris will be left destitute . . . You may leave the stand.—Cross-examined by attorney Aponte: Do you live on a small piece of land which belonged to Victoria, your wife?—Yes, sir.—Do you know for sure that that land is going to be given to Iris?—Yes, sir.—That is all.—Re-cross-examined by the Judge: What was the property left by your wife?—Seven and a half acres of land and a house.—Did she leave anything else?—That was all that we had, and when she died, as it was in the name of her father . . . No, what was the property that belonged to you and your wife?—That was the property.—What you have done is to leave that child destitute. Do you say you love her as a father?—Yes, sir, I love her as a daughter.—You may leave the stand.''

This is the most serious of the incidents upon which appellants based their charge of passion and prejudice. Mandés was also recalled to the stand at a later stage of the trial and again questioned by the trial judge who also addressed one or two somewhat similar questions, although in much milder form, to one of the plaintiffs who had testified as a witness.

It must be and is conceded that the conduct of the trial judge does not indicate any bias in favor of the plaintiffs. But the court was confronted with a difficult and trying situation. The position in which the child Iris had been placed was a feature of the case that would make a strong appeal to the conscience as well as the heart of any fair-minded magistrate.

Certainly no effort was made to conceal what was in the mind of the court. A dishonest judge might have been more

discreet. The outburst in question can not be commended as an example of the mental attitude that characterizes a calm judicial temperament. Nevertheless, all things considered, we are persuaded that in the instant case all that was said and done by the district judge may be regarded as amounting to no more than a timely warning to plaintiffs that it was incumbent upon them to establish their claim by clear and convincing proof. Unquestionably that is the law as laid down by this court in *Alcaide* v. *Morales,* relied upon by the court below and based upon the decisions of the Supreme Court of Spain quoted therein.

██ The evidence, as we have already indicated, must be viewed, as it seems to have been considered by the court below, from the standpoint of the law governing this case.

The guardian *ad litem* offered no evidence for the defense and, when asked at the close of the trial what he had to say, made the following response:

"I can not do it at this time. I believe *prima facie* that Mandés is estopped to request the nullity of the entry as to the birth of this child. Just imagine, Your Honor, that from a legitimate daughter that she appeared to be this girl is going to become an adulterine daughter! I am not prepared at this moment to report on the case definitely."

Thereupon the judge gave the *fiscal* ten days within which to file a brief and another ten days to plaintiffs within which to reply.

Obviously no hasty and premature conclusion was reached, but the matter was taken under advisement and the result was announced after a month or six weeks of conscientious deliberation as evinced by the statement filed at the end of that period and quoted above at the outset.

In the result so reached we fully concur.

The argument for appellants, without any reason beyond the fact that no testimony was offered for the defense, assumes, but wholly fails to show, that here is no conflict in the evidence. The brief entirely overlooks, if it does not

deliberately ignore, the defensive strength of the position occupied by the real defendant, Iris Mandés, based upon her *prima facie* civil status as evidenced by the entry in the civil registry. That entry reads as follows:

"In Guayama, P. R., on March 19, 1914, at 2 p. m., by virtue of the statement made before me by Isabelino Mandés, of age, married, a merchant, a native of Guayama, and a resident of the ward of Guamaní of Guayama, I, Juan Alfredo Blondet, keeper of the civil registry, do hereby extend this birth entry, making it to appear:— 1. That at nine o'clock in the morning of February 27, nineteen hundred and fourteen (1914), a girl of the white race was born who was given the name 'Iris'.—2. That said child is the legitimate daughter of the informant, whose personal description is already stated, and of his wife, Victoria Cruet, of age, married, dedicated to the occupations of her sex, a native of Guayama, and a resident of the ward of Guamaní of Guayama.—3. That her paternal grandparents are Sebastián Mandés, a native of Guayama, now deceased, and Rosa Montes, a native of Guayama and domiciled on Luis Venega street of Guayama, dedicated to the occupations of her sex, and her maternal grandparents are José Cruet and Ramona Colón, natives of Guayama, domiciled on Hostos street of Guayama, property owners and dedicated, respectively, to the occupations of their sex.—4. That . . . 5. That the said Isabelino Mandés made the statement herein entered as father of the said child.—6. That this was stated before witnesses Gabriel Capó Cintrón, of age, married, employee, native of Guayama, and domiciled at No. 25 Ashford street of Guayama, and José Juan Vidal, married, employee, and domiciled at No. 10 Hostos street of Guayama. And the foregoing have been read to the persons mentioned therein, said witnesses testify to the truth of the statement and all of them approve, ratify, and sign it, all of which is attested by me, the keeper of the civil registry.—(Signed): Isabelino Mandés,—Gabriel Capó,—José Juan Vidal,—and Juan A. Blondet, keeper of the civil registry."

Isabelino Mandés testified that the infant Iris was about a week old when rescued from drowning by his wife and "another man." He also said under cross-examination (extract *supra*) that the entry in the civil registry was made thirty-five days after such rescue. Obviously upon this basis the maximum period between the date of birth and the date

of registry would be some six weeks. The entry itself speci-
fied approximately one half of this period and to that extent
may be regarded as having furnished sufficient and substan-
tial corroboration on this point.

Unfortunately for plaintiffs, however, the death certif-
icate of Antonia Rivera indicates that she died on May 15,
1913, about ten months before the birth of Iris, according to
the star witness Mandés and according to the civil registry.
Another curious circumstance is that Mandés follows the
averment of the complaint in his statement that his wife
participated in the rescue and took possession of the infant
at that time. The real hero of that occasion, on the other
hand, makes no mention of Victoria Cruet as having been
present, but says that thereafter Guadalupe Aponte, an uncle
of Antonia Rivera Aponte, asked him if he wanted the child;
that witness declined upon the ground that his wife had
just presented him with twins and suggested to the uncle
that he give the child to Victoria; that thereupon the uncle
"went and talked with" Victoria; that witness saw Guadalupe
Aponte deliver the child some three weeks later and that An-
tonia Rivera died about the same time. This witness also
says that he knows the age of Iris Mandés because the twins
were born in 1912 about the time of the attempted infanticide.

The surname of the witness last mentioned is suggestive
of a family relationship with another witness whose testi-
mony, to the end that it may speak for itself, is quoted in
full, as follows:

"Estefanía Poventud, examined by attorney Aponte, testified
under oath as follows: What is your name?—Estefanía Poventud.—
Where do you live?—In the Planta.—Of what town?—Of Guayama.
—Did you know Victoria Cruet?—Yes, sir.—Do you know Isabelino
Mandés?—Also.—Did you know Antonia Rivera Aponte?—I did not
know her. I saw her on two occasions when she was insane.—And
Juan Montero, did you know him?—Yes, sir.—Do you know anything
about the birth of the child Iris?—The only thing I know is that
when that girl was given to Isabelino Mandés and Victoria Cruet
she was very small and I lived in the house and took care of her,

and I myself was told by them not to tell her that they were not her parents; they were always telling me that.—Then you know that she was not their daughter?—No, sir, she was not their daughter; they brought her up.—And the mother of that child was seen by you there twice when she was insane?—Yes, sir.—What did she do there? —She came to the house and sat in a hammock and swung herself, saying that she was going to pass through the partition wall.—Attorney: That is all.—Cross-examined by the district attorney: Who was seen by you there?—The mother of Iris.—Did you see her with the child?—No, the child had been given already.—Who gave her?—I do not know, I was in the house when Victoria arrived and said to me: 'Look, Yayita, what the Kings have brought me.'—Then you believe that Victoria never had children?—No, sir, never.—That is all.—Cross-examined by the Judge: How old was that child when the Kings presented it to the Mandéses?—I can not tell you.—But more or less?—I know that she was not a month old as yet.—Was she a very small child?—Very small, it could hardly be seen when wrapped in its swaddling clothes.—You may leave the stand.''

With the exception of Isabelino Mandés, who is identified as a merchant; of Julio Cruet, a son of José Cruet, deceased, and Eladio Ortiz, a peon, Estefanía Poventud is the only witness in the case in regard to whom there is any inkling, however remote, as to occupation, social standing or financial responsibility. Adolfo Poventud, Mandés and Estefanía Poventud are the only eyewitnesses to the alleged delivery of the child, if Estefanía can be so considered. Mandés, as already pointed out, says that his wife rescued the child and brought it home some five weeks before the birth was recorded. Adolfo, as also already indicated, says that Guadalupe Aponte took the child to the Mandés house at a time antedating the entry in the civil registry by more than a year. Estefanía uses the plural but gives no names. Her nearest approach to anything definite in this regard is found in her quotation of the statement attributed to Victoria Cruet to the effect that the Three Kings had played the role of stork.

Guadalupe Aponte, who at least had a roof to shelter his demented niece and who is a brother of Francisco Aponte,

candidate for appointment as guardian *ad litem* and prominent as a witness for plaintiffs, was conspicuous by his absence.

Francisco Aponte says that he knew Antonia Rivera, Isabelino Mandés, Victoria Cruet and a child called Iris who was related to witness, being the daughter of his niece, Antonia Rivera y Aponte. That the father and mother of Antonia Rivera were Santos Rivera and Margarita Aponte; that the father of Iris was Juan Montero; that the mother was Antonia Rivera; that Juan Montero and Antonia Rivera lived together; that witness had never had any conversation with the child; that he had talked with her; that she had asked witness and witness had told her that he was related to her; (on cross-examination) that witness knows that the child is not the daughter of Mandés, "but they raised her," from the date of her birth; that witness knows Antonia Rivera to be the mother of the child because she had it in the house of that *muchacha* Francisca, the wife of Bautista Soto; that the witness knows nothing about the transfer of the child to the home of Mandés but that "they raised it"; that the child, having been the daughter of Antonia Rivera, can not be the daughter of Mrs. Mandés; that witness can not swear (*asegurar*) that the child is not the daughter of Mrs. Mandés.

Francisca Vicente says: That she knew Antonia Rivera who lived in a room rented to her by the husband of witness; that witness knew Juan Montero, the husband of Antonia Rivera; also knew Isabelino Mandés and Victoria Cruet; that witness knew a child named Iris; that the child was in the court room (pointing her out); that the child was born in a room rented by the husband of witness to Juan Montero, husband of Antonia Rivera; (in reply to the question "husband or paramour?", witness answered "paramour"); that Montero came and went, but he rented the room for Antonia Rivera; that the child was born in the room occupied by them; that this occurred about twelve

years, more or less, before the date of the trial; that the midwife who officiated was Antonia Reyes who died three years before the trial; that the mother about nine days after the birth of the child became insane, and the husband who was at work hired a peon to take her to the house of her uncle, Guadalupe Aponte; that as to what occurred after that witness knew nothing; that the peon was named Eladio Ortiz.

Eladio Ortiz testified to the transportation by him of Antonia Rivera and her baby from a house of Bautista Soto to the dwelling of the uncle, Guadalupe Aponte.

The statement made by Julio Cruet is direct and unequivocal. It is perhaps the most trustworthy, if not the only trustworthy, testimony in the instant case in so far as the matters mentioned therein are shown to be within the personal knowledge of the witness. It deals for the most part, however, with matters which do not affect the main issue. This witness does say that Iris is not the child of Victoria Cruet and that Victoria died without issue. He frankly admits that he did not know the parents of the child, and he was not asked as to the source of his information that Iris was a foster child or the manner in which his knowledge of that fact, if known to him to be a fact, was acquired. In the absence of any such showing, the bare statement of this witness that his sister had no children is not enough to overthrow a civil status of more than ten years' standing upon the books of the civil registry. If there be any truth in the testimony of the other witnesses for plaintiffs, and especially in the statement made by Mandés with reference to his consultation with Domínguez, then it is most unfortunate for appellants that Domínguez was not called as a witness. A word of corroboration from him on this point would have been worth more than all the other testimony in the case in so far as the identification of Iris Mandés as the daughter of Antonia Rivera Aponte is concerned.

For the purposes of this opinion it may be conceded,

without holding, that the complaint stated a cause of action as against the defendant Iris Mandés in so far as it assails her *prima facie* status as the legitimate daughter of Victoria Cruet, and seeks a cancellation of the entry in the civil registry to that extent. It does not follow that the same theory must prevail in regard to the like status of the child as the daughter of Isabelino Mandés and as to a cancellation of the entry in its entirety. Nor is it necessarily true that the entry must stand as an indivisible whole or else be erased *in toto*.

The death certificate of Antonia Rivera shows that she had been divorced. Neither the date of the decree nor the date of the marriage between Mandés and Victoria Cruet are known. For aught that appears from the record Mandés may have been the husband of Antonia Rivera prior to his marriage to Victoria Cruet and the divorce may have been granted within 300 days of the birth of the child conceived by Antonia Rivera, in which event the alleged natural child would be more or less conclusively presumed to be the legitimate daughter of Isabelino Mandés. *Núñez* v. *Lacot*, 32 P.R.R. 76. It is no answer to this suggestion to say that the possibility of such a combination of circumstances is rather remote. The point is that the continuance or extinguishment of the legal status of Iris Mandés as a legitimate daughter of Isabelino Mandés is not of necessity dependent upon the continuance or extinguishment of her legal status as the legitimate daughter of Victoria Cruet.

Isabelino Mandés neither in his own right nor as the pretended father of Iris Mandés had any claim whatever to any part of the property left by José Cruet at his death. Iris Mandés, likewise, had no claim whatever upon such property by reason of her relationship to Isabelino Mandés. By the same token plaintiffs had no interest in the legal status of Iris Mandés as the legitimate daugher of Isabelino Mandés, no legitimate right to investigate the paternity of the said Iris Mandés, and no cause of action against the said

Isabelino Mandés, either as an individual defendant or as the pretended father of Iris Mandés.

The decision of this case, however, does not turn upon any one or all of the propositions last aforesaid.

According to all the testimony for plaintiffs they were willing and in fact had agreed with Mandés to forego all claim to what Iris Mandés had already received by inheritance directly from her mother. In so far as such inheritance is concerned, it can not be claimed, therefore, that Mandés made any financial sacrifice by becoming a witness for plaintiffs.

Iris Mandés as the legitimate daughter of Victoria Cruet would have received at most from the Cruet estate, according to the testimony of all the witnesses except Mandés himself, about one thousand (1,000) dollars. This award, whether in cash or, as more often happens, in the form of more or less unprofitable real estate, would have been subject in the handling and management thereof to the restrictions imposed by law upon the control and disposition of property belonging to minors. Viewing the matter from a purely mercenary standpoint, the pecuniary advantage to Mandés himself accruing from such an award would be insignificant as compared with the relief from all paternal responsibility in connection with the support, maintenance and education of his legitimate daughter Iris, to say nothing of other conceivable considerations. Nevertheless the direct result of the decree prayed for in the complaint, whether or not intended by plaintiffs and by Mandés himself, would be to relieve the latter of the burden and responsibilities incident to the *patria potestas*.

We are unable to assume with appellants, therefore, that Mandés was in fact testifying against his pecuniary interest.

But be this as it may, Mandés by his own statement was utterly unscrupulous in the matter of misrepresentations which he now says were deliberately made by him "*in good faith*" in 1914. Upon the theory that his later state-

ment is true in so far as this earlier incident is concerned, we are somewhat at a loss to account for his conscientious scruples which seem to have supervened at some time subsequent to the death of his wife and prior to the filing of the complaint herein.

On the other hand, if he told the truth in 1914, his testimony on the stand eleven years later in the instant case can not possibly be true; and the most salient factor in the case from beginning to end is the presumption in favor of the legal status arising out of the representations made by Mandés himself in 1914.

A picturesque re-statement of the principle that must govern this aspect of the case has been quoted with approval by this court upon two previous occasions. It may be found in *Quevedo* v. *Pino,* 15 P.R.R. 669, and again in *Rico* v. *López,* 21 P.R.R. 201.

The judgment appealed from will be affirmed.

Mr. Justice Wolf concurred.

Justices Aldrey and Franco Soto dissented.

### CONCURRING OPINION OF MR. JUSTICE WOLF.

In its main lines I agree with the opinion of the court. Perhaps it should be more greatly stressed that in cases of this kind, even a fair probability in favor of complainants is not sufficient, but the evidence should be clear and convincing. However, what in part has led me to file a concurring opinion is that I cannot see how the testimony of Domínguez, the supposed attorney of Mandés, would have been admissible. If it was, I agree that the failure to present him was significant.

Likewise, I largely base my concurrence on another consideration, only partially set forth in the main opinion. Her supposed father being alive and having made a record in her favor as a legitimate child, none of the complainants had any interest or capacity to attack the status of Iris Mandés. Mandés, to my mind, was the only living person who had a

right to bring such an action. The complainants were strangers in law.

Isabelino Mandés y Montes appeared in the Civil Registry of Guayama on March 19, 1914, and caused the birth of the child Iris to be recorded as having occurred on the 17th of February of the same year, and the said child as being his legitimate daughter by his wife, Victoria Cruet Colón, and the grandchild of José Cruet Arroyo. Victoria Cruet Colón died six years later and two years thereafter, or on the 14th of June, 1922, José Cruet Arroyo, father of Victoria Cruet, also died. In 1924 the widow of José Cruet Arroyo and the children of that marriage sued Isabelino Mandés and the child Iris, averring in their complaint the facts hereinbefore stated and, besides, that when the said Isabelino Mandés caused the child Iris to be recorded as his legitimate daughter by his wife Victoria Cruet he knew that the said child was not their daughter, inasmuch as they did not have any living children on the date of the registration, nor thereafter; that they believe in good faith, from information they have, that the said child Iris is the illegitimate daughter of Antonia Rivera and Juan Montero, her birth having taken place at a house of Juan Bautista Soto, in Guayama; that the said child Iris was born some time prior to the date set forth as the date of her birth in the entry in the civil registry; that said child was picked up by Victoria Cruet, wife of Mandés, at the moment when her mother, through her mental derangement, was trying to sink her in the Guamaní river when the child was fifteen or twenty days old, and that Victoria Cruet at the time of her death had no descendants; that the real and true mother of Iris was Antonia Rivera, who died at Guayama on the 15th of May, 1913; that the plaintiffs, having to proceed to the partition of the inheritance of José Cruet Arroyo, who died after the

death of his daughter Victoria, have not been able to carry out said partition because it becomes necessary to declare void and of no effect the status of legitimate daughter of the child Iris, inasmuch as her registration as legitimate daughter is false, and because, if that record should stand, the child Iris would be entitled to inherit from José Cruet Arroyo in representation of his daughter Victoria, said record thus impairing the rights of the widow and children of José Cruet Arroyo. On those averments the plaintiffs prayed the court to adjudge void and of no legal effect the status of legitimate daughter of the said child Iris appearing in the entry of her birth in the civil registry.

The plaintiffs petitioned the district court to appoint as guardian *ad litem* for the child Iris her uncle Francisco Aponte, but the court appointed the district attorney. The default of the defendant Isabelino Mandés was entered, there appearing from the record before this court no answer filed by the guardian *ad litem*. Finally the case was tried, there being present the guardian *ad litem,* and the court rendered judgment dismissing the complaint. From this judgment the plaintiffs have taken this appeal.

The ground on which the appellants base their appeal is that the lower court, in dismissing the complaint, committed manifest error in weighing the evidence and was moved by prejudice.

The prejudice of a court when deciding questions submitted to it is not always based on improper, illegitimate or noxious motives against one of the parties, but it may originate from the nature of the question at issue, from an excessive zeal for what one believes is just, and especially from a kind disposition towards childhood, the sex and other analogous tender conditions. In cases like this in which the judge is under the impression that the true purpose of the suit is not to clear up and determine whether the little girl Iris is the legitimate daughter of the Mandés-Cruet marriage, to the end that, if she should not be, she may not be reckoned

as an heir wherein she could only intervene as the legitimate daughter of such marriage, but simply to deprive thereby a child of her inheritance, in these cases the zeal for the protection of the child's inheritance gives birth to a prejudice in the judge's mind, not of a venal character, but rather altruistic and unconscious, but a prejudice nevertheless and one that places the judge in a position of not being able to weigh calmly the evidence before him to decide the true question, which is whether or not as a matter of reality the child in question is the legitimate daughter of certain persons. And that is what happened in this case. The judge of the lower court, in his zeal to protect the inheritance of the minor child as the legitimate offspring of the Mandés-Cruet marriage, was all through the trial under the impression that this suit had been brought, not for the purpose of deciding the primal question of relationship, but to take away from this minor her inheritance, as may be seen from his questions at the trial, which we will now proceed to examine.

Isabelino Mandés testified at the trial that from his marriage with Victoria Cruet, and upon her death, there were no children; that Iris had been picked up by them when she was seven days old, when the mother was drowning her in the river; that the child's mother was named Antonia Rivera, who died in the hospital, and her father was Juan Montero, who was living; that he loved the child as if she were his own child; that his wife picked up that child and he recorded her in good faith as the legitimate daughter of their marriage, to complete the charitable act, as they had no offspring; that after the child had been recorded as the legitimate daughter of their marriage he consulted a lawyer who told him that he should have consulted the matter with the court and that they should have adopted the child, without recording her as a legitimate daughter; that Victoria's father, the supposed grandfather of the child, died leaving some children and his wife, and when asked the reason why

he was now saying that the child was not his daughter, he replied that the heirs of Victoria's father wanted to arrange their testamentary matters; whereupon the following dialogue was held between the judge and the witness: "Judge: Why did you wait till now to do this? Why did you not do this before?—Witness: I should have done it before.—Judge: Are you a widower?—Witness: Yes, sir.—Judge: So that... who would inherit from your wife at present, as things stand now?—Witness: Her relatives.—Judge: But at present, if that child was a legitimate child, who would inherit from her, would it not be Iris?—Witness: Yes, sir.—Judge: So that *at present what they are seeking to do is to disinherit Iris.* And if you had done this before your wife perhaps would have adopted her, or might have left her a legacy?—Witness: I should have done this before.—Judge: *And you did not do it to crush that little girl.* That is the point, and now, when the mother is dead, there is nothing that can be done, and Iris will be left on the street. . . You may retire." When this was over counsel for the plaintiffs asked the witness if he was not living on a piece of land which belonged to his wife, and he replied in the affirmative, and that the same was going to be passed over to Iris. Thereupon the judge intervened once more, the witness replying to him that the land consisted of seven and a half *cuerdas,* and that that was what he and his wife held, the judge forthwith asserting: *"What they have done thereby is to crush that child.* You say that you love the child as her father? —Witness: Yes, sir, I love her as my daughter.—Judge: You may withdraw." After other witnesses had testified Isabelino Mandés was again called to the stand, the following questions only having been put to him: "Judge: Who is José Cruet Arroyo?—Witness: My father-in-law, he died. —Judge: And Ramona Colón, who is she?—Witness: My mother-in-law, she is living.—Judge: And Julio, Monserrate, Domingo, Marcolina, and Carmen Cruet y Colón, are they brothers and sisters of your wife?—Witness: Yes, sir.—

Judge: *So that what they are discussing here is your wife's inheritance to take it away from that little girl?*—Witness: Yes, sir.—Judge: You may go." Later on the judge, in his written opinion in the case to dismiss the complaint, asserts that this is a special case where it is intended to deprive a child from twelve to fifteen years old of her rights by legitimation and, with them, of her share in the inheritance of her grandfather, and the child is entirely in the hands of parties antagonistic to her rights.

What we have transcribed here will convince us of the fact that from the beginning to the end of this suit the judge was laboring under the idea that the purpose of the suit was solely to deprive this child of the inheritance to which she might be entitled out of José Cruet Arroyo's estate as the legal representative of Victoria, and not to ascertain the fact whether or not the child was really the daughter of said Victoria and her husband Isabelino Mandés, an idea which prompts the judge to state in his opinion that if he had before him the said Victoria, Antonia Rivera and Juan Montero perhaps he would change his opinion, when from the evidence he knew that to be impossible, because both women were dead and because Juan Montero was not compelled to give an answer to a question that might subject him to prosecution for adultery. And that prejudice was what led the judge to state in his opinion that said Victoria had accomplished the legitimation of Iris and repeat further on that it was she who legitimated the child, when as a matter of fact the said Victoria did not do such a thing, but it was her husband who did it by recording the child as his legitimate daughter of his marriage with said Victoria. These statements the judge repeats once more when he says that said Victoria is charged with the false legitimation that is now contested. And this prejudice in the judge's mind also leads him to error in the weighing of the evidence, which, in our opinion, was sufficient to sustain the complaint, as may be seen from the abstract that we will make of it.

Besides the testimony of Isabelino Mandés, which we have quoted before, there were other witnesses who testified for the plaintiffs at the trial held on April 24, 1924. Francisca Vicente testified that Antonia Rivera lived in her house, in a room rented by her paramour Juan Montero, and there they had the child Iris, who was born there some twelve years ago, the said Antonia Rivera having been assisted during childbirth by Antonia Reyes, who died some three years ago; that about nine days after the child was born the mother became insane and as her husband was at his work, the witness' husband hired laborer Eladio Ortiz to take her over to the house of Lupe Aponte, her uncle; that she witnessed the birth of that child, and that about eight days thereafter she was taken to Mandés' house because her mother had become insane. Eladio Ortiz testified that he knew the child Iris; that she is the daughter of Antonia Rivera and was born in the house of Francisca Vicente; that he did not witness her birth, but that about nine days thereafter he was hired to take Antonia Rivera to the house of her uncle Lupe Aponte, where he took her with her daughter, the person who is present at this trial. Adolfo Poventud testified to have known Antonia Rivera and Juan Montero; that he was their neighbor and he knew that the child Iris came into the house of Isabelino Mandés and his wife Victoria Cruet because the mother of the child, Antonia Rivera, having become insane, was taken to the house of her uncle Guadalupe Aponte, and the witness being standing by a brook, the mother plunged with her child into the deep pond, whereupon the witness ran and took the child from the insane woman, after which her uncle offered the child to the witness, but he did not accept her because his wife had given him twins, and it was then that the uncle spoke to said Victoria and she took the child; that Juan Montero was living with Antonia Rivera as her husband before the child was born and it was then that he saw Antonia Rivera pregnant; that he also saw Antonia Rivera after the childbirth; that that child is the same one

the said Victoria picked up; that the child is thirteen years old, which fact he knows because his wife had given him twins on the same date, and his son is thirteen years old and was born in 1912; that that child was taken to Isabelino Mandés' house when she was about twenty days old; that her mother died insane in the Guayama Hospital; that he saw when Guadalupe Aponte took the child to Mandés' house, to be taken in as a daughter, when the mother was still living, and that Juan Montero was in the house when the child was born, but afterwards he left for Comerío; that he was a married man and was working as a mechanic in the Irrigation Works of Guayama. Estefanía Poventud did not know Antonia Rivera, but she saw her when she became insane, and she knows that Iris was very small when she was turned over to the spouses Mandés-Cruet; that Victoria said to her at the time: "See what the Three Kings have brought me"; that the witness was in Mandés' house and was the person charged with looking after the child, and Mandés had warned her not to say to the child that they were not her parents; that that child was not the daughter of the spouses Mandés-Cruet, who never had any children, but they brought her up; that the child's mother she saw on two occasions, when she went to see her daughter. Francisco Aponte, uncle of Antonia Rivera, testified that the child Iris is a relative of his, because she is the daughter of his niece Antonia Rivera, and that he knew Juan Montero, who is the father of the child, and he knows that they lived together on the property of Francisca, the wife of Bautista Soto; that he had spoken to the child and told her that they were relatives because she asked him, and that he knows it to be a fact that that child is not the daughter of the Mandés-Cruet spouses, but that they brought her up since she was born. Julio Cruet testified that his sister Victoria left no children when she died; that she is not the mother of Iris; that he knew the child's parents; that his sister Victoria left a landed estate and it was the intention of José Cruet's heirs to leave this estate

to the child, because the person who brought the child up had intimated that when this business should be terminated the said property should be conveyed to the child although she was not her daughter, and that if Iris were the daughter of Victoria she would be entitled to about one thousand dollars out of the estate of José Cruet Arroyo.

From the documentary evidence also appears as proved the death of José Cruet Arroyo, which occurred on the 15th of May, 1913, and from his will that the plaintiffs herein are his heirs. The assessment made by the Treasurer of the property left by José Cruet Arroyo aggregates $10,050, and as half of this amount is community property belonging to the widow, there will be a remnant of $5,025 to be divided among her six children, and if Iris should be the legitimate daughter of Victoria, then that amount would have to be divided among seven heirs, the sum of $717 to be allotted to each, should there be no reduction of the inheritance.

It is true that the evidence in cases of this nature should be strong, robust and convincing; but, in our opinion, those requirements are met in the evidence submitted at the trial of this case, since all of the witnesses, among whom are relatives of the child, testified that she is not the daughter of the spouses Mandés-Cruet, there being no contradiction among them, and being worthy of credit the testimony of Isabelino Mandés because he testified against his own interest, inasmuch as if Iris were the legitimate offspring of his marriage with Victoria the child would be entitled to a share in the inheritance of José Cruet Arroyo. And the interest of said Isabelino Mandés in the share falling to Iris is not limited to the usufruct of it during the minority of the child, but he would have over said share the right of inheritance in case the death of the child occurred before she had any offspring.

It is urged in the opinion of the majority of this court that Mandés did not explain why he did not follow the advice given to him by attorney Domínguez, but that explana-

tion can be found among his own words, since he testified that he had consulted the lawyer after he had recorded the child as his legitimate daughter, and that the lawyer limited himself to saying that in place of that registration he should have adopted the child as his daughter, but he did not advise him what to do to set aside what had been wrongly done. It is also said that this lawyer should have been brought in as a witness to corroborate Mandés' statement, but this witness could not be permitted to testify, his testimony being *res inter alios acta.*

We cannot agree either with the statement made by the majority of the judges of this court to the effect that the demeanor of the district judge at the trial was only a timely warning to the plaintiffs that it was incumbent upon them on instituting a suit to be ready with robust and convincing evidence to prove their case, because nothing of that nature can be inferred from his words, but only the expression of a fixed idea in his mind that the plaintiffs wanted to take an inheritance away from this child. And the judges of this court, in affirming the judgment appealed from, go as far as supposing, without any basis for it, that the child may be the daughter of Mandés and Antonia Rivera, only because it does not appear from the trial the date of the marriage of Mandés and Victoria, nor the date when Antonia Rivera was divorced. It is also said that Mandés testified that his wife and another man had prevented the child from being drowned, and he had taken possession of her at that moment, and that the true hero on that occasion (Adolfo Poventud) does not mention that Victoria had been present, but said that later on Guadalupe Aponte, uncle of Antonia Rivera, asked him if he wanted the child, and that he refused her and suggested to him to pass her over to Victoria, and that it was then that the uncle spoke to Victoria; that he witnessed the turning over of the child some three weeks after, and that Antonia Rivera died just about that time. However, we cannot see those contradictions that it is in-

tended to point out, for what Mandés said was that the mother of the child jumped into the brook, and that on the screaming that ensued his wife and a man ran out and picked her up, and as she did not have a family, he took her to his house and brought her up; which does not mean that it was then, just at that very moment, that he took up the child, and that the said child might not have been turned over to him until some days later. Nor does the fact that Poventud limited himself to speaking of his intervention in the incident, without referring to Victoria, exclude the possibility of her taking part in the act of saving the life of the child. And finally the fact that the witnesses did not agree as to the exact date of Iris' birth is no ground either for dismissing the complaint, for that point is an accessory and immaterial fact in this suit, wherein the real and sole question is whether or not the child is the daughter of the spouses Mandés-Cruet. Because the question of dates as a rule is a weak proposition among witnesses, as can be seen from the testimony of Adolfo Poventud, pointed out as the hero on that occasion, who testified at the trial in 1924 that his son, who was of the same age as Iris, was thirteen years old, stating nevertheless that he was born in 1912, which statement would bring his son down to twelve years old. And because from the testimony of all the witnesses the conclusion is reached that Iris was born in 1913, all of the witnesses testifying as to the insanity of Antonia Rivera shortly after her labor, which fact determined the turning over of the child to somebody else while still so small, and that said Antonia Rivera died shortly thereafter, her death appearing from documentary evidence to have occurred the 15th of May, 1913.

The evidence in this case leads us to the conclusion that this is one of the instances where the generous feeling of a childless marriage would prompt it to record as its legitimate offspring the child of other parents, with the noble aim of protecting a helpless child, and transmitting to it their in-

heritance, never giving any thought to the possibility of the death of either one of the fictitious parents, and with it the impairing of the rights of persons who had nothing to do with the legitimation, and who have no alternative but to attack it or permitting that a strange person get into their family and be the subject of an inheritance to which he or she is not entitled, thereby reducing their share. And when cases of this nature are brought to the cognizance of the courts no thought should be given to speculations as to whether the persons claiming have as sole motive to secure a few hundreds or thousands of dollars more, but the court should have in mind that, independently of that fact, the real question is whether or not the persons recording a child as their legitimate offspring are the true parents of such child. The case would not be a new one where a married couple, getting old and impelled by noble feelings, should record as their child the offspring, the natural progeny of a married couple that would not listen to the dictates of their conscience, and the true legitimate children, growing deeply attached to the strange child, have refused to assail such legitimation, permitting that said child be allotted a share in the inheritance as if he really were the offspring of the said married couple.

In fine, we should assert that there is legal nexus between the plaintiffs and the defendants, a fact which was denied in the concurring opinion, because if the child Iris is not the legitimate daughter of the spouses Mandés-Cruet, her appearing as such would impair the rights of José Cruet Arroyo's heirs, inasmuch as it would reduce the hereditary share of each heir by having to allot to the child a share equal to theirs, and as wherever there is a wrong there is always a remedy, as this court asserted in the case of *Garcia* v. *Garcia,* 18 P.R.R. 932, a case which is very similar to the one under consideration inasmuch as in the former case a child was seeking to annul the registration of its birth in the civil registry as the illegitimate son of a man who was

not his father, but who recognized him as such through his affection for him, and in which case the district court was also laboring under the idea that the recognition or acknowledgment of said minor as the son of the defendant could not be assailed.

Finally, we are of the opinion that the judgment appealed from should have been reversed, rendering in lieu thereof another for the plaintiffs.

I am authorized by Mr. Justice Franco Soto to state that he concurs in this dissenting opinion.